**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **TCF Inventory Finance, Inc.,** | ) | **CASE NO. 1: 11 CV 85** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **Northshore Outdoor, Inc.,** *et al.*, | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendants.** | ) | |

This is a diversity action to recover amounts allegedly owed under a Wholesale

Security Agreement and related loan documents.  Pending before the Court is Plaintiff's

Motion for Summary Judgment (Doc. 24).  For the reasons stated below, the motion is

granted in part and denied in part.

**Facts[1]**

---

[1]

Plaintiff has submitted a nine page "Statement of Material Facts" separate from its
memorandum in support of summary judgment and purports to incorporate the facts set out in
the statement into its memorandum in support of summary judgment.  This separately-filed
Statement of Material Facts is not authorized practice in this district.  Nevertheless, in that no
objection to the statement of facts was made, the Court has considered facts in the statement
that were expressly referred to plaintiff's memorandum in support of summary judgment.

1

Plaintiff TCF Inventory Finance (TCF) is a commercial lender with its principal place of business in Illinois.  Defendant Northshore Outdoor, Inc. (Northshore) is an Ohio corporation located in Ashtabula, Ohio that sells outdoor lawn and garden equipment to retail customers.  Individual defendants Dawn M. Allen (Dawn Allen) and Kristopher S. Allen (Kris Allen) are the owners of Northshore and residents of Jefferson, Ohio.

Shortly after Dawn and Kris Allen started Northshore, they decided to become a dealer of "Cub Cadet" lawn and garden power equipment manufactured by MTD Consumer Group, Inc. (MTD).  Harry Mayes, a territory sales manager for MTD was the MTD salesperson with whom the Allens dealt.

In order to become a Cub Cadet dealer and carry Cub Cadet inventory, MTD required that Northshore be approved by and obtain financing from Textron Financial Corporation (Textron).  (Hayes Aff., p. 19.)  Northshore applied for and was approved for financing by Textron and became an MTD dealer.

On or about October 22, 2002, Northshore entered into a Wholesale Security Agreement (Security Agreement) with Textron.  (Pltf. SOF, ¶ 9.)  On October 22, 2002, Dawn and Kris Allen also entered into a Guaranty with Textron whereby they personally guaranteed Northshore's obligations under the Security Agreement.  In addition, in connection with the financing, Northshore entered into an "MTD Products– Dealer Program Letter" (Dealer Program Letter) with Textron on October 28, 2002.

The Security Agreement provides that the debtor (Northshore) promises to pay the secured party (Textron) for financed collateral that Northshore "sold."  Specifically, the Security Agreement provides that "all payments received by the Debtor shall be held in trust

2

for the Secured Party up to and including the amount of the Total Debt attributable to the

Collateral sold."  (Security Agreement, ¶ 2.)  The Dealer Program Letter likewise provides:

> This is a pay as sold program unless otherwise specifically indicated on
> MTD's invoice or the monthly billing statement.  Payment should be submitted
> by Dealer or on behalf of Dealer to Textron Financial.  Remittances are
> required at least weekly for any Inventory that has been sold during the prior
> week.  Customer agrees that all payments received by the Customer shall be
> held in trust for Textron Financial up to an including the amount of the total
> debt attributable to such Inventory sold, until such time such payments are paid
> to Textron Financial by or on behalf of the Customer.

(Dealer Program Letter, p. 1.)[2]

Under its financing arrangement with Textron/TCF, Northshore ordered Cub Cadet

equipment from MTD; Textron/TCF financed the equipment by paying MTD for the

equipment; and then Northshore would repay Textron/TCF for "sold" financed equipment

according to the terms of the Security Agreement.  (Hayes Dep., p. 20.)

On June 1, 2009, Textron assigned its rights in Northshore's account to TCF pursuant

to an Assignment Agreement.  Northshore made payments to TCF the same way it made

payments to Textron through an online system.  Northshore indicated online the units for

which it was paying and then transmitted payments to TCF electronically.  In addition, on a

periodic basis, in accordance with the terms of the Dealer Program Letter, inspectors for

Textron and later TCF visited Northshore to inspect the status of financed inventory.  (D.

Allen Aff., ¶ 3.)  After the inspections, the inspector would identify what items of financed

inventory he concluded were "SAU," meaning "sold and unpaid" such that Northshore was

required to repay TCF for them.  According to defendants, there were instances where the

---

[2]

In 2009, Northshore signed a revised Dealer Program Letter containing similar
provisions.

inspector would mistakenly code "demo" equipment that was not physically present in the store as sold and unpaid when, in fact, such demo equipment had not been sold.  According to defendants, after Northshore communicated to TCF what units on the inspector's list were actually unsold demo units, the demo units were often re-coded, and TCF would typically send Northshore a "reconciliation report" as to the SAUs, so that Northshore would only be responsible for paying for items that had actually been sold.  (D. Allen Dep., at 71-72; D. Allen Aff., ¶ 3.).  Dawn Allen states that over the years, this mis-coding and reconciling of items occurred on a routine basis.  (D. Allen Aff., ¶ 3.)

The parties did not experience problems from 2002 until mid-2010.  Mr. Mayes testified that, from 2002 until 2010, Northshore was an excellent dealer for MTD and was near the top of Cub Cadet's sales ladder on an annual basis.  (Hayes Dep. at 31-32.)

However, according to TCF, it began to perceive problems with Northshore beginning in mid-2010.  Paula Levering, TCF's Senior Account Manager responsible for TCF's account with Northshore, states in an affidavit that, beginning in mid-2010, she observed that "each time an inventory inspection occurred, the inventory identified as sold or in poor condition was increasing and that Northshore was taking longer to pay [TCF] for sold inventory." (Levering Aff., ¶ 18.)  According to Levering, based on "those worsening trends," TCF sent an Operational Expectations Letter to Northshore on October 5, 2010.  (*Id*. at ¶ 19.)  The letter stated:

> Please accept this letter as a guideline to TCF Inventory Finance's Operational Expectations that are customary with a Pay as Sold Program:
>
> 1.  Invoice amounts on sold items should be paid to TCF on a weekly or bi-weekly basis.  Not voluntarily releasing payments between inspections is unacceptable.  Currently your company has **$43,761.00** due on Sold and

4

Unpaid inventory . . . .

2.  All items determined sold at the time of inspection should be paid at inspection or no more than 5 days after the inspection date.  At times there has been a 10 to 20 day delay before payment is received for sold inventory. . . .

5.  Demoed units must not be out for two consecutive inspections and must be either verified in stock or paid.

6.  TCF Inventory Finance **does not** finance "Used" inventory on the MTD Program, therefore, inventory that is not in new, unused, undamaged, complete, and saleable condition is considered due in full as a result of default.

Additionally, your company has **$20,446.00** due on equipment that is now considered "Used" based on the hour usage and condition. . . .

Your company has a Total Balance of **$64,207.00** due on invoices from Sold and Unpaid inventory and Used inventory.  If this amount is not paid on or before **October 15, 2010**, we will proceed with the default process in an effort to collect the balance owed. . .

If you have any questions about the amounts due, or any of our operational policies, please call 800-348-412 ext. 7328 to discuss.

(Levering Aff., Ex. 6) (emphasis in original.)

According to Levering, following this letter, Northshore made partial payments on October 8, 2010, and October 14, 2010, but did not respond to TCF's Operational Expectations Letter.  (*Id.*, ¶ 21.)  Levering states that when Northshore failed to pay all amounts identified in the Operational Expectations Letter and failed to respond to the letter, TCF sent Northshore a Notice of Default on October 15, 2010, stating that Northshore was in Default of the Security Agreement and that Northshore owed TCF a total of $36,221.00, including $18,897.00 in Used Inventory and $17,324.00 in Sold and Unpaid Inventory, and demanding that payment be made by October 22, 2010.  (Levering Aff., Ex. 7.)

Dawn Allen sent Levering an email after receiving the October 15, 2010 default

5

letter, stating that Northshore would make payment for any SAUs by October 22, 2010, that Northshore would be able to make additional payments on October 29th, and requesting that TCF work with Northshore.  The email stated:

> The SAU's except for serial #1C278Z00043 which is a demo unit will be paid for by 10/22/10.  As for the "used" equipment which was used for demo's [sic] as per Cub Cadet, I will not be able to pay them until the 29th of October.  I realize to you all this puts us in a "defult" [sic] status.  I am however trying to work thru this the best I can and never had any intentions not to pay any of this.  If this is all unsatisfactory to you then let me know when you will be here to pick up the remaining unsold equipment and we will help you load it.  Otherwise a bit of working with us would be appreciated.

(D. Allen Aff., Ex. 2, p. 2.)  Levering responded to this email, acknowledging Northshore's response and stating that TCF would work with Northshore.  (Levering, Aff. ¶ 25.)  On October 21, 2010, Kris Allen sent TCF an email, stating in part:  "As of yesterday all of the SAU's that were really SAU's were paid."  (Allen Aff., Ex. B.)

According to Dawn Allen, she never indicated to Levering that she "agreed with TCF's miscoded items" in the October 15th default letter.  Rather, it is Ms. Allen's position that "Northshore had in fact paid for all items sold by the deadline set forth in the 'default' letter" and that TCF's "miscoded items were not 'sold,' but were items either sitting in Northshore's store or [were] being used by a customer as a demo."  (D. Allen Aff., ¶ 11.)

Allen contends the entire problem between the parties arose because in mid-2010, a new inspector for TCF, Scott Mercurio, began conducting the inventory audits for TCF.  (*Id.* at ¶ 4.)  Unlike prior inspectors, Mr. Mercurio took the position that "demo" equipment which had not been sold, as well as accessories that had been put on unsold equipment for purposes of display in Northshore's showroom, had to be paid for by Northshore.  (*Id.*)  Ms. Allen states that she complained to TCF and Harry Mayes about this "miscoding" of unsold items.

6

(*Id.*, ¶¶ 6, 10.)  In particular, Allen sent an email to Mr. Mayes on July 23, 2010, complaining

of the inspector's conduct.  The email stated:

> I just wanted to make both of you aware[3] of some things that our dealership is
> facing due to our last inspection from TCF.  When the inspector left he coded a
> total of $62,081 in SAU.  Because this is over $50,000, I received a phone call
> from Paula Levering stating that if this is not paid in full in 5 days that she is
> required to send a "letter" to her main office.  I am sure that this "letter" will
> somehow affect our ability to do business with both Cub Cadet and TCF.
>
> Now, my side of this is that many items were miscoded during the inspection
> and that the total SAU's were under $50,000, in fact the total was $30,910.
> Quite a significant difference from $62,081.  Here is a list of miscoded items,
> some have been recoded and some have not. . . .
>
> My husband Kris puts his heart and soul into this business and I am beyond
> distraught that I have to go thru this and be questioned as if I am lying about
> the demo units.  Every month when they inspect us we have to deal with this
> distrust issue.  I realize that we are just one dealer to MTD and are replaceable
> but I want to make sure that MTD is aware of what is going on between TCF
> and Northshore Outdoor and that we are being as honest as we possibly can be.
>
> One last thing. . . I will have the legitimate SAU's taken care of within the 5
> day time frame because that is how I do business.

(*Id.*, ¶ 6, Ex. 1.)

Allen states that Northshore had "paid the SAUs in the same manner over the course

of eight-plus years," yet "did not receive any notification from TCF noting a worsening trend

with respect to the SAUs."  (D. Allen Aff., ¶ 12.)  According to Allen, the "only thing that

appears to have changed was the definition of what was considered 'sold'" by TCF.  (*Id.*)

Allen states that the new inspector "miscoded" SAU equipment on each subsequent

visit.  She states that, each time, she voiced her objection to the miscoding to TCF through Mr.

---

[3]

　　　The email is also addressed to Gary Schumacher, but Allen's affidavit does not state
who Mr. Schumacher is.

7

Mayes, and her objections resulted in SAU items being re-coded by TCF.  She states that

during the months leading up to October 2010, she contacted TCF through Mayes, and TCF

responded to her through Mayes.  (Allen Aff., ¶ 7.)  Mayes testified that he communicated

with TCF on Northshore's behalf when Northshore maintained that certain units on the

inspector's SAU inventory list were actually unsold demo units.  (Mayes Dep. at 35-37; 44-

46.)  However, in October 2010, TCF did not agree to re-code equipment.

Mayes also testified that the problem between Northshore and TCF arose because of a

dispute about the re-coding of demo equipment.  Mayes testified:

> There was never a credit issue.  They [Northshore] never owed money they
> couldn't pay.  There was never any of that.  The problem all along were the
> demo units.  That was the issue.  It was not that they [Northshore] couldn't pay
> their bills.  It was that the demo units that kept being marked as missing and
> Paula would demand payment and she would call up and they would discuss it
> and that was the whole issue.  It was demo units.  It was never on units that
> were sold and not paid for.

(Mayes Dep., at p.51.)

Ms. Allen further states that, in or around October 2010, Northshore was unable to

order equipment from MTD to sell to customers because of a credit hold by TCF.  (Allen Aff.,

¶ 13.)  She states that "[g]iven the problems that Northshore was having regarding the

miscoded items, the fact that TCF had put Northshore on credit hold, and the stress it caused

[her], [she] made the decision to close the retail store."  (*Id*. at ¶ 8.)  Allen states that she

communicated her intention regarding the store to Mr. Mayes, who attempted (with another

MTD representative, Randy Stineman) to persuade her to change her mind.  She states that

Mayes indicated he would contact TCF on her behalf.  According to Allen, her plan was to

close the retail store for the winter and try to sell the business to an interested purchaser,

8

David Barnum.  (*Id.* at ¶ 9.)

Levering, however, states that no one at Northshore ever contacted to TCF to let TCF know the store was closing.  (Levering Aff., ¶ 26.)  Instead, Levering states that she discovered the store was closed when she was contacted by Scott Mercurio on November 1, 2010, who informed her that there were signs posted at Northshore's store indicating that the store had closed as of October 15, 2010.  (*Id.* at ¶ 27.)  Mercurio arrived at Northshore during its regular business hours to conduct an inspection on November 1, 2010.  When he arrived, the doors to the store were closed and locked, the store lights were turned off, and there were two signs posted in the window.  The first sign stated: "WE ARE IN THE PROCESS OF GOING THROUGH OUR INVENTORY.  SO IF WE HAVE SOMETHING HERE THAT BELONG TO YOU, WE WILL BE CONTACTING YOU WITHIN THE NEXT 30 DAYS.  THANK YOU."  The second sign said: "DUE TO UNFORSEEN CIRCUMSTANCES OUR STORE WILL BE CLOSING INDEFINITELY AS OF FRIDAY, OCTOBER 15, 2010.  THANK YOU."  (Affidavit of Scott Mercurio, ¶ 8.)

Upon learning that Northshore had closed, Levering contacted MTD and made arrangements with MTD to have the financed inventory at Northshore repossessed.  (Levering Aff., ¶ 29.)  Randy Stineman of MTD assisted with the repossession.  Stineman stated that he arranged the repossession with Northshore's store manager, Kasey Allen.  (Stineman Dep. at 38, 39.)

According to Scott Mercurio, who represented TCF at the repossession, numerous items financed by TCF were not at the Northshore store during the repossession.  (Mercurio Aff., ¶ 14.)  Mercurio states that Kasey Allen told him that Northshore was keeping some of

9

the inventory that had been financed by TCF and that Northshore would repay TCF for that inventory.  (*Id.* at ¶ 15.)  Northshore disputes this.  Allen states that "all equipment" that Northshore had was repossessed except for one item that had been approved by MTD to be donated to a local school and four other items that had been sold by Northshore between October 21, 2010, and the time of repossession.  (Allen Aff., ¶ 15.)

Following the repossession, on November 19, 2010, TCF sent Northshore a new notice of "default," demanding payment in the amount of $78,569.28, representing $77,008.45 for financed inventory that TCF determined it was not able to repossess and for $1,560.83 in interest and other charges.  (Levering Aff., ¶ 30.)

On December 2, 2010, TCF sent Northshore and its Guarantors another letter, accelerating the amounts due under the "Loan Documents" and demanding payment in the amount of $478, 994.21, representing the total outstanding financed balance determined by TCF.  (*Id.* at ¶ 31.)

Counsel for TCF sent Northshore and the Guarantors a final demand letter on December 16, 2010.  (*Id.* at ¶ 32.)

TCF resold inventory it repossessed in private sales.  It contends it was able to sell the items it repossessed for nearly 100% of their original invoice amount.  However, TCF contends, a deficiency balance exists.  (Levering Aff., ¶ 34.)

TCF filed this action against Northshore and Kris and Dawn Allen on January 13, 2011, alleging that Northshore defaulted under and breached the Security Agreement.  Count I alleges that Northshore breached the "loan and security documents" – generally identified in the complaint as "the Security Agreement, the Joint Guaranty, the Assignment Agreement and

all other agreements with [Northshore]" –  by failing to remit payment for sold inventory as required.  TCF's complaint alleges Northshore owes it $79,056.47 plus interest.[4]  Count I is a claim for breach of contract against Northshore.  Counts II and III are claims for breach of contract against Dawn and Kris Allen pursuant to the Guaranty.

Defendants answered the complaint, generally denying its material allegations and asserting counterclaims.  Count One of the Counterclaim alleges that TCF breached the Security Agreement by repossessing the Cub Cadet equipment without a contractual basis.  Count Two alleges a claim for tortious interference with Northshore's Dealer Agreement with MTD and with Northshore's "numerous business contracts/relationships with customers of the equipment."  Count Three alleges a claim that TCF breached the terms of the Guaranty by declaring a default when no default occurred.  TCF moves for summary judgment in its favor on its claims against defendants and on defendants' counterclaims.

**Standard of Review**

Federal Rule of Civil Procedure 56 governs summary judgment and provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled judgment as a matter of law."  The procedure set out in Rule 56(c) requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion."  This can be done by citation to "materials in the record," including depositions, documents, affidavits, stipulations, and electronically stored information.  Fed. R. Civ. P. 56(c)(1)(A).  Rule 56(c)(1)(B) allows a party to "show[]

---

[4]

Levering states in her affidavit that, as of October 31, 2011, the total amount due is $86,408.27.  (Levering Aff., ¶43.)

11

that the materials cited do not establish the absence or presence of a genuine dispute, or that

an adverse party cannot produce admissible evidence to support the fact."

After the moving party has carried its initial burden of showing that there are no

genuine issues of material fact in dispute, the burden shifts to the non-moving party to present

specific facts demonstrating that there is a genuine issue for trial.  *Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  "The 'mere possibility' of a factual

dispute is not enough."  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1986).  In order

to defeat a motion for summary judgment, the non-moving party must present probative

evidence that supports its position.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-

50 (1986).  In determining a motion for summary judgment, the non-moving party's evidence

is to be believed, and all justifiable inferences are to be drawn in that party's favor.  *Id.* at

255.

### Discussion

TCF argues that there are no material facts in dispute that Northshore is "liable" to it

for breach of the Security Agreement.  The parties do not dispute that the Security Agreement

is to be interpreted and construed under Rhode Island law.  Under Rhode Island law, a

"breach of contract claim requires the existence of a contract, a breach, and damages."

*Feinstein v. Brown*, 432 F. Supp.2d 258, 269 (D.R.I. 2006).

TCF argues in its motion for summary judgment that Northshore breached the

Security Agreement in two ways.  First, TCF contends Northshore breached the provision in

the Security Agreement requiring Northshore to pay TCF promptly for "sold" inventory

financed by TCF.  (*See* TCF Br. at 5; Rep. at 3).[5]  TCF contends Northshore breached this contractual obligation because Northshore did not pay TCF for all of the SAUs and other used equipment identified by TCF in the Operational Expectations Letter it sent to Northshore on October 5, 2010.  (TCF Br. at 5.)  TCF argues that Northshore breached the Security Agreement in "fail[ing] to make all the required payments, even after receiving [the] Operational Expectations Letter."  (*Id.*)

In addition, TCF also contends in its motion for summary judgment that Northshore defaulted on its obligations under the Security Agreement by closing its store on October 15, 2010, and that this conduct constitutes an additional "event of default under the Loan Documents."  (TCF Br. at 3.)  Northshore's closing of its store, however, was not alleged in the complaint as a basis for TCF's breach of contract claim.

TCF contends that, as a result of Northshore's "defaults" under the Security Agreement, TCF properly availed itself of its right under the Security Agreement to enter Northshore's premises and repossess Northshore's inventory.

TCF contends there is no dispute that Northshore defaulted under the loan agreements and presently owes TCF $86,408.27 plus interest for unpaid financed inventory.

In its opposition brief, Northshore denies that a breach or default under the Security Agreement occurred, arguing that, "[a]t the very least, an issue of fact exists as whether Northshore was in default at the time TCF declared default."  (Opp. at 13).  Northshore's

---

[5]

As set out in the fact section above, the Security Agreement provides that "all payments received by [Northshore] shall be held in trust for [TCF] up to and including the amount of the Total Debt attributable to the Collateral **sold**." (Security Agreement, ¶ 2) (emphasis added.)  The Dealer Program Letter also requires Northshore to pay for inventory "as sold."

position is that it paid TCF for all equipment it actually sold at the time of TCF's declaration of default and repossession.  Northshore points to its communications, set out in the fact section above, in which it took the position that it had paid TCF for all true SAUs, which did not include demo equipment or accessories used for display in its showroom.  Northshore disputes TCF's position that it had a contractual obligation to pay for all of the items for which TCF demanded payment in its Operational Expectations Letter.  Northshore maintains that any items identified in the letter for which Northshore did not pay were either demo equipment or were otherwise unsold.  Northshore points out that the Security Agreement and Dealer Program letter obligated it to remit payment to TCF only for "sold" equipment. Northshore asserts:  "TCF has cited no language that obligated Northshore to pay for [the] disputed inventory prior to it actually being sold."  (Opp. at 11.)  In addition, Northshore argues that for almost nine years, "TCF's course of performance was to not treat demo and other unsold equipment as SAUs," pointing out that prior to June 2010, Textron and then TCF "recoded demo equipment and accessories so that these were not treated as being SAU."  (*Id.* at 11.)  Northshore contends this course of performance is relevant in ascertaining the meaning of the parties' agreement.

As to the closing of its store, Northshore does not dispute that it closed its doors on October 15, 2010.  However, Northshore asserts that its actions in closing the store were triggered by TCF's wrongful conduct in demanding payment for equipment that had not been sold.  (Opp. at 12.)  Northshore contends that TCF incorrectly declared Northshore to be in default on October 15, 2010, and that TCF's conduct in the preceding months (demanding that Northshore pay for items that were not "sold") caused the demise of Northshore's

14

business.  Further, Northshore contends it informed MTD that Northshore wanted to close the retail store in the winter and try to sell the business later to an interested purchaser, but the MTD representatives never indicated that Northshore was in default for closing the retail store.  (Opp. at 7.)

TCF's motion for summary judgment is denied as to its breach of contract claims. There is no dispute that Northshore was contractually obligated under the Security Agreement and Dealer Program Letter to pay TCF for financed inventory that Northshore "sold." However, a genuine issue of material fact exists as to what the parties considered sold inventory to be.  Northshore's argument is persuasive that TCF has not identified a contractual provision that defines "sold" inventory.  Northshore has submitted evidence indicating that the parties had a course of conduct by which demo and accessory items were routinely re-coded and, therefore, were not considered "sold."[6]  Northshore has also submitted evidence indicating that it paid for all equipment it considered to be truly "sold" per the parties' course of conduct by October 20, 2010.  This evidence is sufficient to create an issue of fact as to whether Northshore defaulted under the Security Agreement by failing to pay for all "sold" inventory.  Therefore, TCF is not entitled to summary judgment on its claim that Northshore breached the Security Agreement in failing to pay for sold inventory as demanded in TCF's Operational Expectations and other demand letters.[7]

---

[6]

Under Rhode Island law, course of performance is relevant is ascertaining the meaning of the parties' agreement.  R.I. Gen. Laws § 6A-1-303.

[7]

TCF appears to argue in its reply brief that Northshore was in "default" of its obligation to pay for sold inventory because Northshore did not pay for all sold inventory when TCF declared default on October 15, 2010, but arguably paid for all sold inventory at

As to TCF's argument that Northshore defaulted under the terms of the Security Agreement by closing its store on October 15, 2010, while there is no dispute that Northshore closed its store, TCF has not demonstrated that it is entitled to summary judgment on its breach of contract claim on this basis.  First, as noted above, TCF's complaint does not allege the closing of Northshore as a basis for its breach of contract claim.  Further, TCF does not explain in its motion for summary judgment how Northshore's "default" under the Security Agreement by closing its store supports a damage action for breach of contract by TCF.[8] Accordingly, TCF has not demonstrated that it is entitled to summary judgment on its breach of contract claim on the basis that Northshore defaulted under the Security Agreement by closing its store.

For the reasons discussed, TCF's motion for summary judgment on Count One of the Complaint is denied.  TCF's motion for summary judgment is also denied as to Counts Two and Three against Dawn and Kris Allen.  Counts Two and Three are brought against Dawn and Kris Allen solely in their capacity as guarantors of Northshore's contractual obligations under the Security Agreement.  In that summary judgment is not warranted on TCF's breach of contract claim against Northshore, summary judgment is also unwarranted against the

the earliest by October 20, 2010.  (*See* Rep. at 3.)  This argument does not demonstrate that TCF is entitled to summary judgment on its breach of contract claim.  If Northshore had not fully paid TCF for sold inventory (and was in "default") as of October 15, 2010, but nevertheless paid for all sold inventory by October 20, 2010, then Northshore would not *currently* be liable to TCF for breaching the contract's requirement to pay for sold inventory.

[8]

Rather, TCF argues in its motion for summary judgment that Northshore's default in closing its store justified TCF's repossession of financed equipment at the store under the terms of the Security Agreement.  (*See* TCF Br. at 12.)

16

Allens personally as guarantors.

This leaves TCF's motion for summary judgment on Northshore's counterclaims.  As noted above, Count One of the Counterclaim alleges that TCF breached the Security Agreement by repossessing equipment without a contractual basis for doing so.  TCF argues that it is entitled to summary judgment on this counterclaim because it "properly exercised its contractual right in the Security Agreement to repossess inventory from Northshore following numerous defaults by Northshore," including "Northshore's failure to pay [TCF] for inventory upon a sale of financed inventory and Northshore's closing its store doors as of October 15, 2010."  (TCF Br. at 12.)  TCF contends these defaults justified its repossession of inventory under paragraph 10 of the Security Agreement, which provides:  "Upon a default hereunder . . . Secured Party may . . . enter into any premises . . . where Secured Party concludes the Collateral may be . . . [and] repossess all of any items of Collateral."

As discussed above, a genuine issue of material fact exists as to whether Northshore defaulted under the Security Agreement by failing to pay for all sold inventory.  In that this alleged "default" has not been proven on summary judgment, it cannot be said that this constituted a contractual basis for TCF to repossess Northshore's inventory.  However, paragraph 9(e) of the Security Agreement provides that an event of default occurs if the debtor "ceases to do business as a going concern or there occurs a material change in the ownership or the management of the [debtor's] business."  TCF has submitted evidence that Northshore closed its doors for business as of October 15, 2010 (specifically, evidence that signs were posted on Northshore's doors on November 1, 2010, stating that the store had closed indefinitely as of October 15, 2010).

17

Northshore does not specifically respond to TCF's argument that Northshore defaulted under the terms of the Security Agreement by closing its doors for business as of October 15, 2010, other than to say that TCF's wrongful conduct in demanding payment for unsold items was what caused it to close its doors and that Northshore communicated its plans about its dealership to MTD.  (*See* Opp. at 12.)  Even though Northshore blames TCF for its need to close its dealership and contends that TCF knew or should have known about what was happening, Northshore does not argue or demonstrate that a genuine issue of material fact exists as to whether it in fact closed its doors for business and ceased to operate as a going concern as of October 15, 2010.  The undisputed evidence demonstrates that TCF had a contractual basis to repossess Northshore's Cub Cadet inventory in that Northshore closed its doors for business and ceased to operate as a going concern.  The plain language of paragraph 9(e) of the Security Agreement classifies this occurrence as an event of default, and the plain language of paragraph 10 authorizes TCF to repossess inventory in this circumstance. Accordingly, TCF is entitled to summary judgment on Count One of Northshore's Counterclaim.

TCF next argues that the Court should grant it summary judgment on Northshore's counterclaim for tortious interference because "the undisputed facts establish that [TCF] did not interfere with either the MTD Dealer Agreement or any contract with a customer of Northshore."  (TCF Br. at 13.)  Citing to its "Statement of Undisputed Facts," TCF argues it did not interfere with any contract because:  (1) "MTD independently declared Northshore to be in default of the MTD Dealer Agreement, because Northshore closed its store"; (2) "At his deposition, K. Allen abandoned the contention that [TCF] tortiously interfered with the MTD

Dealer Agreement"; and (3) TCF "could not intentionally interfere with any prospective contracts between Northshore and its customers, because [TCF] had no knowledge of sales or potential sales arranged by Northshore" but "only learned of the sale of inventory" when Northshore "paid for inventory as sold" or when TCF "discovered that inventory was missing at an inventory inspection."  (TCF Br. at 13.)

Northshore does not dispute that Kris Allen stated that he did not contend TCF interfered with any contract between Northshore and MTD in his deposition.  However, Northshore argues this testimony does not bar its claim that TCF interfered with its dealership agreement with MTD because Dawn Allen, who was designated by Northshore as its corporate representative, stated on Northshore's behalf in interrogatory responses that: "[TCF] interfered with the MTD contract when it improperly refused to release equipment for sale, declared a default and repossessed Northshore's equipment.  At that time, [TCF] knew that such actions would have a detrimental impact on Northshore's ability to remain a Cub Cadet dealer."  (Opp. at 15-16.)  Northshore also disputes TCF's position that MTD "independently" declared Northshore in default, relying on deposition testimony by Mr. Mayes that MTD did not "do anything" when it first learned of Northshore closing because "MTD lets TCF take the first step."  (Opp. at 15.)  Finally, Northshore disputes TCF's "vague claims that it could not know that Northshore had lost sales due to TCF's conduct," arguing: "Given that TCF placed a credit hold on Northshore's credit, it seems incredible and unbelievable that TCF would not have reasonably determined that such action [would] interfere with Northshore's ability to sell products to its customers."  (Opp. at 16.)

In its reply brief, TCF states only that Kris Allen's deposition testimony constitutes an

"admission against interest that binds Northshore," and it disputes Northshore's assertion that TCF put a credit hold on Northshore, citing affidavit testimony by Paula Levering that TCF did not do so.

Given the parties' arguments, the Court does not find summary judgment appropriate as to Northshore's tortious interference counterclaim.  Genuine issues of material fact exist as to TCF's asserted bases in support of summary judgment.  First, there are genuine issues of material fact as to whether MTD declared Northshore to be in default of its dealer agreement "independent of" the actions of TCF as TCF asserts.  There is also conflicting evidence as to whether Northshore "abandoned" its tortious interference claim.  Finally, a genuine issue of material fact exists as to whether TCF had knowlege that its actions vis-a-vis Northshore would interfere with Northshore's ability to makes sales to customers.  There is conflicting evidence as to whether TCF placed Northshore on a credit hold.

TCF finally moves for summary judgment on Northshore's third counterclaim (that TCF breached the Guaranty by declaring default when no default occurred).  The only basis asserted for summary judgment on this counterclaim is that TCF "properly declared a default on October 15, 2010, because Northshore had not repaid [TCF] for all financed inventory that had been sold by Northshore, and it had not repaid [TCF] for inventory that was no longer in new and unused condition."  (TCF Br. at 13-14.)  However, as discussed above in connection with TCF's breach of contract claim, genuine issues of material fact exist regarding the amount of inventory that was "sold" under the Security Agreement and whether Northshore paid for all "sold" inventory.  Accordingly, TCF's motion for summary judgment as to the third counterclaim is denied.

20

**Conclusion**

For the reasons discussed above, TCF's motion for summary judgment is granted only on Northshore's first counterclaim that TCF repossessed Northshore's inventory without a contractual basis for doing so.  TCF's motion for summary judgment is otherwise denied.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 2/10/12

21